# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

CRAIG A. MUELLER,                      )
                                       )
    Claimant,                          )
                                       )
v.                                     )          Case No.  CV407-088
                                       )
MICHAEL J. ASTRUE,                     )
*Commissioner of Social Security*,     )
                                       )
    Defendant.                         )

## <u>REPORT AND RECOMMENDATION</u>

On June 21, 2007, Craig A. Mueller filed a complaint with this Court appealing the Social Security Commissioner's denial of his application for disability benefits. (Doc. 1.)  For the reasons set forth below, the Court should **REVERSE** the commissioner's decision and **REMAND** the case for further proceedings.

# I. BACKGROUND

Claimant Craig Mueller is a fifty-nine-year-old male who has completed two years of college.[1] (Doc. 11 at 2.) He worked as a general contractor from 1974 to 1993, and he owned and operated a retail hobby shop from 1993 to 2000. (Tr. 109; 156.) On March 10, 2003, claimant applied for disability benefits, alleging that he became disabled on November 6, 2000. (Doc. 11 at 2.)

## A. Procedural History

The Social Security Commissioner denied claimant's application, first on August 20 2003, and again upon reconsideration on January 23, 2004. (Tr. 62, 56.) An Administrative Law Judge ("ALJ") held a hearing on October 26, 2005 and issued a decision on March 29, 2006, denying claimant's benefits application. (Doc. 11 at 2.) After the appeals council rejected claimant's request for review, the ALJ's decision became the final decision of the Commissioner. (Id.) Claimant then filed a complaint in this Court contending that the ALJ's decision was incorrect

---

[1] The ALJ mistakenly stated that claimant was 51 years old at the time of the assessment. (Tr. 38.) Claimant contends that this mistake may have caused an error, because individuals over age 55 are categorized as "advanced age" under the regulations. (Doc. 1 at 11.) Claimant is mistaken, however. Later in the ALJ's opinion, he noted that the claimant was 56 at the time of the assessment. (Tr. 39.)

as a matter of law and was not supported by substantial evidence. (Doc. 1.)

## B.  Medical Records

In August 1999, claimant visited Dr. Joseph Hudson with complaints of a fybromyalgia flare-up. (Tr. 292.) He complained of pain originating in his right hip and buttock, which then moved to his left leg and progressed upwards to his chest. (Id.) The doctor prescribed Vioxx and noted that Ibuprofen also offered some relief. (Id.) Claimant did not return until July 10, 2000, when he once again complained of muscle and joint pain. (Tr. 291.) The doctor ordered some tests and scheduled a follow-up appointment on July 17, 2000, regarding claimant's high blood-pressure. (Id.) At the follow-up appointment, the doctor recommended that claimant visit a rheumatologist and neurologist about his aches and pains. (Tr. 290.)

On August 7, 2000, claimant once again visited Dr. Hudson with the same complaints of migrating muscle and joint pain. (Tr. 289.) The doctor prescribed Paxil, an anti-depressant, and he noted that claimant should try to find a rheumatologist participating in his insurance network. (Id.) After several appointments with repeated complaints of

3

pain, the doctor noted that he had little else to offer and recommended that claimant see a specialist in internal medicine. (Tr. 285.)

On October 6, 2000, claimant first met with Dr. Stephen Herman, an internist in Savannah. (Tr. 280.) Dr. Herman noted that claimant suffered from body aches, including early morning stiffness of fingers, abdominal pain, and tender subcutaneous lesions. (Id.) In addition, he noted that claimant complained of a skin rash. (Id.) He increased claimant's Paxil dose and noted that claimant suffered from recurrent major depression. (Id.) Two weeks later, Dr. Herman noted that claimant returned complaining "of more severe muscle and joint pain of neck, left knee, and left ankle," and he prescribed Imipramine, another anti-depressant. (Tr. 279.) On October 27, 2000, claimant complained of excessive sweating and insomnia. (Id.) A few weeks later, he returned stating that "the sweats are gone" but that he suffered from "wild dreams and hallucinations" and still remained troubled by muscle soreness and back pain. (Tr. 278.) In December 2000, claimant reported that his diffuse muscle pain and his lower back pain were better. (Tr. 277.) But he complained of muscle pain in a return visit in January,

2001. (Tr. 276.) On February 6, 2001, he complained of severe muscle spasms in both thighs. (Tr. 275.)

Dr. Herman had an MRI of the lumbosacral spine performed, and it revealed abnormalities, including degenerative spinal stenosis, disc protrusion at the L4-5 vertebrae, "and an extruded fragment compressing the right L5 nerve root." (Tr. 274.) In addition, the doctor noted that claimant suffered from sciatica. (Id.) Dr. Herman referred claimant to Dr. Lindley, a neurosurgeon, and placed him on Lorcet Plus for pain. (Id.; Tr. 251.) Dr. Lindley immediately recommended that claimant have a microdiscectomy, and he placed claimant on a Medrol Dosepak. (Tr. 257.) Following the microdiscectomy, claimant initially reported "complete relief of his back and leg pain." (Tr. 254.)

In April 2001, claimant again visited Dr. Herman, complaining of lower back pain, abdominal pain, and urinary frequency and urgency. (Tr. 273.) Claimant had at this point stopped taking Imipramine "claiming that he feels better off this medication." (Id.) He told Dr. Herman that he had seen a Dr. Hogan who had referred him to the Mayo Clinic and prescribed him Doxycycline, an antibiotic, which claimant stated cleared up the urinary tract problem. (Id.) Dr. Herman

prescribed Flomax, Vioxx, and Serzone, another anti-depressant.  (Id.)
Claimant returned to Dr. Herman again in May complaining of neck pain
and an intolerance of Flomax because it caused sexual issues.  (Tr. 272.)
Herman discontinued the Flomax, increased the Serzone, and ordered an
MRI of the cervical spine.  (Id.)

Dr. Lindley evaluated the MRI ordered by Dr. Herman, and he
noted that claimant suffered from degenerative spinal arthritis at the C3-
4 vertebrae with C4 nerve root compression.  (Tr. 250.)  In addition, he
noted that claimant had a positive "Spurling's sign"[2] to the right, and he
had a positive straight leg raise with "pain radiating to the posterior
thighs and calves."  (Id.)  Despite the noted spinal disease, Lindley did
not believe that surgical treatment was required.  (Id.)  Instead, he had a
physical therapist show claimant some cervical spine exercises.  (Id.; Tr.
251.)

On July 23, 2001, claimant returned to see Dr. Herman,
complaining of pain in his right buttocks and thigh, which originated
from testicular pain.  (Tr. 270.)  Dr. Herman noted that claimant had
"difficulty with compliance with Serzone," but he encouraged claimant to

---

[2]  This is a maneuver used to assess damage to the spinal nerve roots.  (Doc. 11
at 4.)

continue using the drug. (Id.) The next day claimant saw Dr. Lindley with the same list of complaints. (Tr. 249.) He requested Doxycycline, which he insisted he needed to clear up a continuing urinary tract infection. (Id.) Dr. Lindley stated that he did not know much about Doxycycline, so he prescribed Bactrim in its place. (Id.)

On August 16, 2001, claimant visited Dr. Demicco, another internist. (Tr. 204.) After hearing claimant's laundry list of complaints, he concluded that claimant suffered from Reiter's syndrome, myofascial pain syndrome, and chronic fatigue syndrome. (Id.) He prescribed Doxycycline again, but it provided no help. (Id.) Dr. Demicco noted that he could not "understand the sort of dramatic periods of time where [claimant's] vision improves, so he no longer wears glasses and it lasts just for a few hours where his strength comes back and he is like a young child. Even where his urine stream actually increases." (Id.) Despite the strange set of symptoms, the doctor prescribed Prednisone, which dramatically helped claimant. (Id.) After a month of being on the drug, the doctor concluded that claimant suffered from a rheumatic disorder. (Id.) Dr. Demicco noted claimant had attempted to drop down to a lower dosage of Prednisone but his symptoms had worsened. (Id. at 202-03.)

Demicco increased the dosage and instructed claimant to drop down to a lower dosage when possible. (Tr. 203.)

In October 2001, claimant returned to Dr. Demicco in a very depressed state, "actually crying." (Tr. 203.) Claimant indicated that the effects of the Prednisone had waxed and waned, so Dr. Demicco was concerned that claimant may have some sort of endocrine disorder. (Id.) Claimant also complained of difficulty walking and odd headaches. (Id.) Demicco referred claimant to Dr. Ehsanipoor, an endocrinologist, and prescribed Celexa, another anti-depressant. (Id.) Dr. Ehsanipoor concluded that claimant had a probable adrenal insufficiency and recommended that he gradually reduce his dosage of Prednisone. (Tr. 267.) Claimant returned to Dr. Demicco in January 2002. (Tr. 202.) He had dropped his dosage of Prednisone and had developed nondescript pain under his skin, scales on his skin in patches, and several new moles. (Id.) He also complained of dry and burning eyes. (Id.) Dr. Demicco noted that claimant should probably get a full neurologic workup. (Id.) During the appointment with Dr. Demicco, claimant relayed a disturbing episode where his fatigue had caused him to fall asleep while driving. (Id.)

In February 2002, claimant once again returned to Dr. Demicco, who noted that Dr. Ehsanipoor had started testosterone therapy because of claimant's low levels of the hormone. (Tr. 201.) In addition, claimant was prescribed Provigil, which helped him stay awake. (Id.) At this point, Dr. Demicco was convinced that rather than rheumatological issues, claimant suffered from an endocrine disorder along with depression. (Id.) At claimant's March 2002 appointment, Dr. Demicco noted that claimant had dropped down to a lower dose of Prednisone and had stopped his testosterone shots "because [the shots made] him grow hair on places where he [did not] want to grow hair." (Tr. 200.) Once again, Demicco noted that claimant complained of eye problems, so he had referred him to an ophthalmologist for an eye exam. (Id.) Demicco also prescribed him Doxycycline again, because claimant believed that it would help him wean off of the Prednisone. (Id.)

In April 2002, claimant saw Dr. Ham, a neurologist, at Dr. Hudson's request. (Tr. 244.) Claimant told Dr. Ham that he believed he had suffered from some unknown occult infection because he received relief from Doxycycline. (Id.) Dr. Ham noted that claimant has had "classic migraine periodically, and has excessive fatigue and sleepiness at

times." (Id.) But claimant's neurologic examination was entirely normal. (Tr. 245.) Dr. Ham concluded that claimant suffered from fibromyalgia and chronic fatigue syndrome. (Id.) Claimant returned to Dr. Demicco, who kept him on Doxycycline.[3] (Tr. 200.)

Returning to claimant's back problems, he visited Dr. Lindley again in March 2002. (Tr. 248.) He complained of increased pain in his neck and right shoulder. (Id.) Dr. Lindley noted no specific Spurling's sign and recommended that claimant use a cervical traction-distraction collar. (Id.) In November 2002, claimant visited Dr. James Dewberry, an orthopedist, because he desired a change of physician from Dr. Lindley. (Tr. 235.) Dr. Dewberry noted that claimant had had six months of mechanical symptoms including persistent neck and back pain. (Id.) Dewberry had several x-rays taken, which showed multilevel degenerative disease and anterior spurring of the cervical spine. (Id.) Dewberry recommended anti-inflammatory medications and epidural steroid injections. (Tr. 234.)

---

[3] At some point between March and July 2002, claimant went to Emory University for a thorough examination. (Tr. 200.) According to Dr. Demicco, the physicians at Emory found nothing remarkable before claimant's insurance ran out. (Id.)

After starting treatment with Dr. Dewberry, claimant returned to Dr. Demicco in January 2003. (Tr. 199.) Claimant continued on the Doxycycline. (Id.) He informed Demicco that he had been suffering visual problems and headaches. (Id.) Dr. Demicco referred claimant to Dr. Hoffstetter, a neurologist, and started him on Zanaflex for his back.[4] (Id.) On February 14, 2003, claimant saw Dr. Hoffstetter, who scheduled him for an MRI scan of the brain, a CT scan of the lumbosacral spine, and an EMG nerve conduction study. (Tr. 185.) Claimant returned to Hoffstetter in March 2003, and the doctor ordered an MRI of the cervical spine. (Tr. 184.) During that visit, claimant noted that he could not lift a gallon of milk due to sharp pain in his neck and right arm. (Id.) Hoffstetter prescribed Ultracet for daytime pain management and continued him on the Neurontin. (Id.) He also prescribed physical therapy, which claimant only went to twice before he abandoned it. (Tr. 187.)

---

[4] In early February 2003, claimant visited Dr. Alan Fishman in Atlanta for an insurance consultation. (Tr. 238-241.) Dr. Fishman recommended that claimant go through a "work hardening" program along with psychological counseling in order to seek employment, but he noted that claimant should not be required to lift more than 10 to 15 pounds and should stand for no more than 30-45 minutes at a time. (Tr. 241.)

Claimant returned to Dr. Hoffstetter on April 9, 2003, with similar complaints and some new problems, including numbness in the fourth and fifth fingers on the right hand. (Tr. 183.) The doctor noted that the cervical MRI showed spinal disc herniation at several levels. (Id.) Because insurance would not pay for pain management, claimant indicated that he was interested in surgery. (Id.) The doctor's notes reflect that claimant declined a Medrol Dose-Pack because of his prior issues with Prednisone. (Id.) Instead, the doctor prescribed Vicodin for pain.[5] (Id.)

At a subsequent visit with Dr. Dewberry, claimant noted that he had seen Dr. Hoffstetter, who had prescribed Neurontin. (Tr. 233.) Claimant brought the MRI Hoffstetter ordered, which showed spurring at the C3-4 disc and a small herniated disc at C5-6. (Id.) Dr. Dewberry prescribed Cataflam. (Id.) Later that month, Dewberry noted that claimant suffered from significant cervical pain, but that he was still improving. (Tr. 231.) Dewberry prescribed Darvocet-N for pain. (Id.) On May 9, 2003, claimant again followed up with Dr. Dewberry, who noted that the Cataflam helped claimant's back, but he still complained

---

[5] The record is not entirely clear on this point. On April 17, 2003, Dr. Dewberry noted that claimant had been on Prednisone for ten days. (Tr. 233.)

of neck pain. (Tr. 230.) Dewberry ordered another MRI of the cervical spine. (Id.)

Claimant returned to Dr. Hoffstetter on Monday, May 14, 2003. (Tr. 182.) Dr. Hoffstetter noted that the Cataflam had significantly helped claimant's lower back issues, but his neck was still troubling him. (Id.) Claimant stated that he had run out of Amantadine, which had helped his chronic fatigue. (Id.) Dr. Hoffstetter refilled the prescription. (Id.)

In early June 2003, claimant returned to Dr. Dewberry, who noted that the cervical MRI he ordered revealed significant narrowing of the spinal canal at C3-4, C4-5, and C6-7. (Tr. 227-229.) In addition, claimant's Spurling's sign was "extremely positive." (Tr. 227.) Consequently, Dewberry recommended surgical intervention, which claimant promptly agreed to. (Id.) After Dewberry performed the surgery, claimant noted significantly less neck pain, but he continued to complain of generalized pain. (Tr. 225-26.) Claimant saw Dr. Demicco after the surgery and noted that his neck and back were much better, but he still complained of near total exhaustion and profuse sweating. (Tr. 180.) Dr. Demicco believed that the excessive perspiration may have

been a side effect of the Amantadine. (Id.) Demicco did not continue claimant on Provigil because it interfered with his sleep. (Id.) Instead, Demicco prescribed Strattera to try to help claimant "stay focused." (Id.)

Claimant returned to Dr. Dewberry complaining of lower back pain in October 2003; he also complained of a growth on the ring finger of his right hand. (Tr. 224.) A 12-day "Steri-pack" provided excellent relief for the back and hand pain. (Tr. 221-224.) Dewberry had another MRI performed, and it only revealed minimal stricture of the spinal canal. (Tr. 221.)

At claimant's November 6, 2003 appointment with Dr. Demicco, he complained of his chronic fatigue syndrome. (Tr. 179.) The Strattera had helped a bit, but it was not enough. (Id.) Dr. Demicco increased the dosage and noted that he wondered if claimant might "have some type of Agent Orange exposure or some sort of Vietnam Syndrome." (Id.) Several months later, in June 2004, claimant saw Dr. John Morley, a rheumatologist. (Tr. 166-67.) Dr. Morley noted that claimant had obvious Heberden node formations[6] involving all of the distal joints in

---

[6] Heberden's nodes are bone growths "about the size of a pea or smaller found on the terminal phalanges of the fingers in osteoarthritis." Stedman's Medical Dictionary 1214 (26th ed. 1995).

both hands. (Tr. 166.) Morley believed claimant suffered from fibromyalgia. (Tr. 167.) Claimant returned to Morley's office in July 2004. (Tr. 165.) Morley had an x-ray performed and noted calcifications and joint damage throughout both of claimant's hands. (Id.) He also noted that it may be worth looking into colitis or inflammatory bowel disease, and he recommended that claimant see a gastroenterologist.[7] (Tr. 164.)

On August 12, 2004, claimant returned to Dr. Dewberry complaining of mid-back and shoulder pain.[8] (Tr. 217.) Dewberry ordered another MRI of the cervical spine and put claimant on Lorcet Plus and Prednisone. (Id.) On August 26, claimant followed up with Dr. Dewberry, who noted that the MRI revealed some stenosis at C3-4 and C5-6, but that his symptoms responded well to traction and he suffered from "no gross weakness." (Tr. 216.)

---

[7] In October 2004, claimant returned to Dr. Morley. (Tr. 163.) Morley noted that claimant was back on Prednisone, he still presented with arthritis in his hands, and he recommended that claimant see a sleep specialist about his exhaustion and shortness of breath. (Id.)

[8] Two days before claimant's follow-up with Dr. Dewberry, claimant saw Dr. Demicco. (Tr. 174.) Demicco noted that claimant had stopped taking Strattera because of the expense and had not continued to take his blood pressure medication. (Id.)

In April 2005, claimant returned to Dr. Demicco. (Tr. 361.) Demicco noted that he still believed that claimant's complaints originate from some exposure he had in Vietnam. (Id.) He restarted claimant on Strattera. (Id.) In May 2005, he prescribed Benicar for claimant's high blood pressure. (Tr. 360.) A month later, claimant returned for a follow-up appointment. (Tr. 358.) He stated that his hands were hurting worse than ever and mentioned several other medical complaints, including a rash. (Id.) Demicco referred claimant to a dermatologist, and he prescribed Donnatal to help with apparent diverticular outbreaks. (Id.)

## C. State Medical Examiners

On August 1, 2003, the state assessed claimant's psychiatric health. (Tr. 343.) The consultant, Dr. Hinnant, found that claimant suffered from depression, but he concluded that the impairment was not severe. (Tr. 343-355.) Later that month, Dr. Awe, a non-examining state medical consultant, determined that claimant could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand or walk for about 6 hours a day, could sit for about 6 hours a day, and could push and pull an unlimited amount. (Tr. 336.) He found that claimant could climb ramps and stairs frequently but could only climb ladders, ropes, and scaffolds

occasionally. (Tr. 337.) He claimed that claimant was capable of balancing, kneeling, and crawling frequently, but could only stoop and crouch occasionally. (Id.) He found no other limitations. As a whole, Dr. Awe believed that the severity or duration of the symptoms was disproportionate to the expected severity from the medical records. (Tr. 340.) Specifically, Dr. Awe found claimant's complaints of muscle and joint pain to be only minimally credible. (Tr. 340.)

On reconsideration in January 2004, Dr. Huber, another non-examining medical consultant, found the same limitations, with the exception that he believed that all climbing (ramps/stairs and ladders/ropes/scaffolds) could only be performed occasionally. (Tr. 329.) Unlike Dr. Awe, however, Dr. Hubar found that the claimant's symptoms were attributable to a medically determinable impairment. (Tr. 332.) Hubar found claimant's complaints of neck and back problems to be credible but noted that they had been treated. (Id.) He noted that claimant's complaints of "fatigue remain elusive." (Id.)

## D. Hearing Testimony

On October 26, 2005, the ALJ held a hearing to determine whether claimant was disabled under the provisions of the Social Security Act.

(Tr. 368-96.) Claimant stated that he first injured his back while he was an Army helicopter pilot in Vietnam. (Tr. 376-77.) First, he fell from the top of his helicopter onto its wing during a training session. (Tr. 376.) Later he had a hard landing at a staging field. (Id.)

Claimant testified that he had not earned income since November 2000, when he sold his hobby shop. (Tr. 374-75, 378.) He stated that he sold his hobby shop because he could not stock the shelves or lift a gallon of fuel, and he had to take frequent naps. (Tr. 385.) Claimant reported that his pain level on a scale of one to ten was a seven from his lower back and his neck. (Tr. 382.) He stated that he cannot stand for more than ten to fifteen minutes, and he cannot sit for more than twenty minutes without standing up. (Id.) He testified that he cannot stoop, has difficulty kneeling, and sometimes finds it painful to operate the foot controls on his car. (Tr. 383) He indicated that the pain from his fibromyalgia hurts all over his body and the pain level is only affected by the amount of narcotic pain relievers he takes over the course of the day. (Tr. 384.)

When questioned about his current physical abilities, he testified that he rarely drives; he only takes a few short trips a month to pick up

his prescriptions. (Tr. 379.) He bathes and dresses himself, but he has difficulty putting on his shoes and has to use a tool to put on his socks. (Id.) He does not cook except to take things out of the refrigerator and put them in the microwave. (Id.) He does not do the dishes, sweep, mop, or vacuum, nor does he go shopping, do laundry, yard work, attend church, visit with family or friends, or handle his own finances. (Tr. 380.) He testified that he naps for up to four hours a day. (Tr. 383.) He avers that he has trouble sleeping due to recurrent nightmares. (Tr. 381.) Despite these limitations, he admitted that he cares for his three small dogs on a daily basis. (Tr. 378-79.) And he stated that he goes out with his wife to dinner two or three times a month. (Tr. 381.)

On examination by his attorney, claimant testified that he is sensitive to bright light, which cause him to suffer headaches. (Tr. 386.) He stated that without Neurontin or Amatadine, he could not open his eyes. (Id.) He also testified that he suffers from a "transient rash," which has spread all over his back, and he treats it using a cortisone cream. (Tr. 387.) He stated that he suffers from terrible fatigue. (Id.) He also testified that he has to do traction twice a day for thirty minutes. (Tr. 388.) He discussed the arthritis in his hands, which he said prevents

him from opening a bottle of Coke or from driving without wearing a driving glove. (Id.) He finally indicated that he needs another surgery on his back that he cannot afford; the traction has helped him put it off. (Tr. 389.) After the attorney wrapped up his questions, the ALJ asked claimant about his depression. (Id.) Claimant said that he came close to suicide before closing his hobby shop. (Tr. 390.) When the ALJ asked some questions about claimant's fatigue, claimant responded that all of his daily medications make his life a little more livable. (Id.)

The ALJ then questioned the vocational expert, Dr. Don Harrison, who discussed claimant's past relevant work, determined that he could not return to that work, but indicated that he could take a sales clerk, order clerk, hotel clerk, distribution clerk, or cashiering job. (Tr. 392-93.) Harrison testified that there were thousands of such jobs in the region. (Id.) When asked if claimant could perform such light work if the ALJ found that claimant suffers from severe ongoing pain and must lie down for several hours a day, Dr. Harrison replied that claimant could not perform any job in the national economy. (Tr. 394-95.)

## II.   ANALYSIS

## A.  Standard of Review

Affirmance of the ALJ's decision is mandatory if the ALJ's conclusions are supported by substantial evidence and based upon an application of correct legal standards.  42 U.S.C. § 405(g); <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002); <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is something more than a mere scintilla, but less than a preponderance."  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted).  It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted).  If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings."  <u>Id.</u> at 1158-1159.  The substitution of this Court's judgment for that of the Commissioner is not allowed.  <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant.  20 C.F.R. § 404.1512; <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  To determine whether claimant has met his burden of proof, the Court looks

to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that he has not engaged in substantial gainful activity. Jones, 190 F.3d at 1228. At step two, he must demonstrate a severe impairment or combination of impairments. Id. Then, at step three, if the claimant's impairment meets or equals a listed impairment, he is automatically found disabled. Id. If not, he must advance to step four, which requires him to prove an inability to perform past relevant work. Id. If he cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." Id.

## B.     The ALJ's Determination

After the hearing, the ALJ found that claimant satisfied step one of the five-step analysis because he had not engaged in substantial gainful activity at any time relevant to the decision. (Tr. 34.) Regarding step two, the ALJ concluded that the medical evidence indicated that claimant's depression was nonsevere, but he found that claimant's degenerative disc disease and fibromyalgia were severe. (Tr. 34-37.) At

step three, the ALJ held that claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (Tr. 37.) He then determined whether claimant retained the residual functional capacity to perform his past relevant work. (Tr. 38.) The ALJ found that claimant could not perform his past relevant work but could perform light work, which is available in sufficient numbers in the national economy. (Tr. 38-39.) Accordingly, the ALJ found claimant was not disabled under the Act. (Tr. 40.)

Claimant contends that the ALJ's analysis was not supported by substantial evidence because he erred in finding that plaintiff retained the residual capacity to work under steps four and five.[9] (Doc. 11.)

---

[9] Claimant also contends that the ALJ erred by finding that his impairments did not automatically qualify him as disabled under step three. The ALJ, upon reviewing claimant's medical history, concluded that claimant suffers from severe fibromyalgia and degenerative arthritis in the cervical and lumbar spine but that claimant's impairments do not meet or exceed any of the impairments listed in the Commissioner's Listing of Impairments. (Tr. 34-37.) Claimant contends that the ALJ's finding was mistaken. (Doc. 11 at 15.) Specifically, claimant avers that the medical evidence establishes that claimant's spinal disorders meet or equal Listing 1.04, which requires a claimant to show:

> Evidence of nerve root compression characterized by neural-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

## C. Residual Functional Capacity

As noted above, the ALJ considered the medical evidence and determined that claimant did not maintain the residual functional capacity to perform his past relevant work. (Tr. 38.) But he found that claimant retained "the residual functional capacity to perform light exertional work with no more than occasional climbing [of] ramps, stairs, ladders, ropes and scaffolds, stooping or crouching." (Tr. 37-38.) In his residual functional capacity analysis, the ALJ explicitly stated that he assigned "great weight to the opinions of [claimant's treating

---

20 C.F.R. Part 404, Subp't P. Appx. 1, § 1.04. Bearing in mind that all criteria from the listing must be met in order for a claimant to qualify for benefits, 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3), neither claimant's lumbar spine nor cervical spine impairments independently justify a finding of disability at step three.

Claimant admits that "[t]he record does not appear to demonstrate motor loss" in the lumbar spine. (Doc. 11 at 17.) As to the cervical spine, claimant relies heavily upon pre-treatment medical records to show that he meets Listing 1.04. He argues that the medical records show that claimant had spondylosis and nerve root compression in his cervical spine in 2001 and that in May 2003, claimant had severe stenosis and moderate to severe canal and foraminal stenosis, with a limited range of motion and motor loss from the impairment. (Doc. 11 at 17.) While all of these statements are true, Dr. Dewberry performed a foraminotomy in June 2003, which greatly decreased claimant's neck pain. (Tr. 37, 180.) Claimant's most recent MRI, performed in August 2004, revealed moderate to severe stenosis, but Dr. Dewberry noted that the pain responded well to traction. (Tr. 216.) In addition, Dewberry found "no gross weakness." (Id.) Even combining the impairments, nothing in the record shows that claimant is presently experiencing any motor loss or muscle weakness. As the record fails to establish that claimant meets Listing 1.04A, the ALJ's determination is supported by substantial evidence.

physicians],[10] in that claimant is limited to light exertional work." (Tr. 38.) Claimant contends, however, that the ALJ's finding was in error because it was directly contrary to the opinions of both of his treating physicians. (Doc. 11 at 22.)

In their functional capacity assessments, Doctors Dewberry and Demicco disagreed about many of claimant's limitations,[11] but both found that even with normal breaks, claimant could not work a full

---

[10] As claimant points out, the ALJ mistakenly attributed both functional assessments in the record to Dr. Dewberry, but one of the two assessments was completed by Dr. Demicco. (Tr. 171, 213.)

[11] On September 27, 2004, Dr. Demicco noted that claimant can lift or carry ten pounds or less occasionally, can sit for two hours a day and stand or walk for two hours a day, can frequently use foot controls, use his fingers for fine manipulation of objects, and grasp items continually. (Tr. 172.) He found that claimant can push and pull, reach (including overhead), and handle items (gross manipulation), only occasionally. (Id.) Claimant's postural limitations permit him to perform nearly any physical movement occasionally, though he should never squat. (Id.) In addition, Demicco found that claimant should avoid constant exposure to certain environments. (Id.) He indicated that claimant has no visual or communicative limitations, but he suffers from constant fatigue and pain. (Tr. 173.)
A day later, Dr. Dewberry submitted his assessment, which stated that claimant can continually lift ten pounds or less, and occasionally lift twenty pounds. (Tr. 213.) He stated that claimant can sit two hours a day and stand or walk two hours a day, can occasionally use foot controls, and need not elevate his legs. (Id.) In addition, he found that claimant can occasionally perform any hand related task, but can frequently handle items. (Tr. 214.) Dr. Dewberry, however, found that claimant's postural limitations were severe, stating that he can bend, climb, and extend his arms out occasionally, but he should never balance, stoop, kneel, crouch, crawl, reach overhead, or squat. (Id.) Dewberry found that claimant suffers from no environmental limitations but should avoid heights and moving machinery. He found that claimant has no communicative limitations but has visual limitations. Finally, Dewberry found that claimant never experiences fatigue, vertigo, or shortness of breath but frequently experiences pain. (Tr. 215.)

eight-hour day. (Tr. 171, 213.) Specifically, they indicated that, even with breaks, claimant can only sit for two hours and stand or walk for two hours in an eight-hour work day.[12] (Tr. 172, 213.) The reasonable inference is that they believed that claimant could not engage in full-time employment, and this inference contradicts the ALJ's finding of "not disabled" at step five of the analysis.

The Eleventh Circuit has given somewhat conflicting signals regarding whether the inability to engage in full-time work requires a finding of 'disabled' at step five of the sequential analysis. Compare Johnson v. Harris, 612 F.2d 993, 998 (5th Cir. 1980) (finding that "a physical limitation which prevents a claimant from working a full work-day, minus a reasonable time for lunch and breaks, constitutes a disability within the meaning of the Act")[13] with Kelley v. Apfel, 158 F.3d 1211, 1215 n.4 (11th Cir. 1999) ("We save for another day the question of the relevance of part-time work at Step Five."). Nevertheless, the

---

[12] Dr. Demicco indicated that he was not absolutely certain how many hours a day claimant could realistically work. (Tr. 171.) Nonetheless, he set the range for both sitting and standing/walking at 1-2 hours. (Id.)

[13] The decision in Johnson was entered in 1980. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981. Consequently, Johnson is binding Eleventh Circuit precedent

Commissioner has determined that "only an ability to do full-time work will prevent a finding of disabled at step five." Carlisle v. Barnhart, 392 F. Supp. 2d 1287, 1290 (D. Ala. 2005) (citing Kelley, 158 F.3d at 1214); McGrane v. Astrue, 2008 WL 686928, at *5-6 (M.D. Fla. Mar. 12, 2008). The Commissioner's determination is set out in Social Security Ruling 96-8p, which states that step five requires a claimant to be able to work "8 hours a day for 5 days a week, or an equivalent work schedule" to avoid finding the claimant disabled.[14] Carlisle, 392 F. Supp. 2d at 1290-91. As the ALJ found that claimant was not disabled at step five, he apparently disregarded the opinions of Doctors Dewberry and Demicco on the issue of full-time employment.[15]

It is well settled that "[t]he opinion of a treating physician . . . 'must be given substantial or considerable weight unless 'good cause' is

---

[14] "[I]f the claimant's [residual functional capacity at step 4] is below that required by his or past relevant work, and is also insufficient to allow sustained full time work, a finding of disabled is compelled by the application of SSR 96-8p [under step 5]." Carlisle, 392 F. Supp. 2d at 1290-91. As noted above, the ALJ determined that claimant did not maintain the residual functional capacity to perform his past relevant work. (Tr. 38.)

[15] The Court notes that the ALJ never explicitly stated that claimant could return to full-time work. (Tr. 39.) It is entirely possible that he made an error of law by presuming that the ability to work part-time satisfied step five of the analysis, rather than disregarding the treating physicians' opinions. It is well established that such an error of law generally necessitates a reversal and remand. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000); see Jackson v. Bowen, 801 F.2d 1291, 1294 (11th Cir. 1986).

shown to the contrary.'"[16] Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)). "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons," and the failure to do so is reversible error. Phillips, 357 F.3d at 1241; Lewis, 125 F.3d at 1440. Doctors Demicco and Dewberry have both spent a considerable amount of time with claimant. The record shows that Dr. Dewberry treated claimant for several years and performed a foraminotomy to treat claimant's neck pain. (Tr. 180.) Similarly, Dr. Demicco treated claimant for at least four years. The ALJ did not articulate any reason to discredit the opinions of these treating physicians as to claimant's capacity to perform full-time work, much less show good cause. In fact, the ALJ stated that he gave the opinions "great weight" except to the extent that they discussed hand pain and leg elevation.[17] (Tr. 38.) Furthermore, the

_____

[16] "Good cause" can be shown where the treating physician's opinion was not bolstered by the evidence, the evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the physician's medical records. Phillips, 357 F.3d at 1241.

[17] The ALJ explicitly discounted the treating physician's claims that "claimant would have difficulty using his hands except for simple g[r]asping and that claimant would need to frequently elevate his legs." (Tr. 38.) He stated that no objective medical evidence supports either claim. (Id.) Claimant does not contest the leg elevation issue. The hands, however, are another matter. Claimant contends that

regulations require that when a treating physician's opinion is not given controlling weight, certain factors be considered in determining what weight to give a medical opinion. 20 C.F.R. § 404.1527(d). Those factors include the examining relationship, length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factors brought to the ALJ's attention. <u>Id.</u> Not one of those factors was explicitly addressed.

Because the ALJ did not address whether claimant is capable of performing full-time work, the Court is unable to determine whether the ALJ's determination is supported by substantial evidence. The Court therefore finds that reversal and remand is appropriate so that the Commissioner may reconsider and evaluate all the evidence of record and

---

both Doctors Morley and Dewberry found degenerative disease in his hands. (Tr. 163, 166, 224.) Rather than discussing the findings, the ALJ fully adopted the findings of the non-examining state medical consultants, who found that claimant could perform light work. (Tr. 38.) The state consultants reviewed claimant's medical records several months before Dr. Morley diagnosed claimant with degenerative disease of the hands. (Tr. 163, 164, 165, 166.) Based upon the objective medical evidence in the record from an examining and treating physician, the Court is not entirely convinced that the ALJ's finding is supported by substantial evidence. The ALJ should reconsider this evidence on remand.

render a decision that provides the Court with a basis for determining whether the correct legal standards were applied.[18]

## III.  CONCLUSION

"Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (quoting Stawls v. Califano, 596 F.2d 1209, 1214 (4th Cir. 1979)).  As the Commissioner has not made such a showing, his decision is not supported by substantial evidence.  Consequently, the Court should **REVERSE** the decision of the Commissioner and **REMAND** this for a rehearing, pursuant to sentence four of 42 U.S.C. § 405(g), so that he can make a decision based on an accurate and thorough consideration of the entire case record. See Ingram v. Astrue, 496 F.3d 1253, 1261 (11th Cir. 2007)

---

[18] As a remand is appropriate based upon the record, the Court declines claimant's invitation to enter a detailed discussion of claimant's subjective allegations supporting his disability.

(noting that sentence four of 42 U.S.C. § 405(g) "provides the federal court 'power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing.'") (citation omitted).

**SO REPORTED AND RECOMMENDED** this <u>22nd</u> day of October, 2008.

<u>/s/ G.R. SMITH</u>
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**